DAVENPORT, Respondent, vs. THE CHICAGO, BURLINGTON & NORTHERN RAILROAD COMPANY, Appellant.

*March 19 — April 8, 1890.*

*Railroads: Fences: Killing of horses on track: Negligence of third person.*

A gate in a railroad fence when properly closed was of legal height, but it might be closed in such a way as to leave it much lower at one end. It having been so closed one evening by a third person, one of the plaintiff's horses jumped over the lower end and in doing so unfastened the gate so that another horse escaped upon the track, and both were killed on the following morning by a locomotive. One of the hooks upon which the gate rested when closed was out of place, but its absence did not interfere with the proper closing of the gate or impair its efficiency when so closed. *Held*, that neither the absence of the hook nor the negligence of the third person rendered the railroad company liable for the killing of the horses.

Davenport vs. The Chicago, Burlington & Northern R. Co.

APPEAL from the Circuit Court for *Crawford* County.

This is an action brought to recover compensation for two horses of the plaintiff which escaped from a pasture adjoining the defendant's railroad, over and through the gate of a farm crossing, and went upon the track, and were there run against and killed by the locomotive of a passenger train. It is alleged that the gate was defective.

The defendant's railroad runs north and south across the farm of one Hudson, and the pasture from which the horses escaped, and into which they were turned with the consent of Hudson, the owner, is west of and adjoining the railroad. Hudson's residence is on the east side of the track. The railroad right of way is fenced on both sides through Hudson's land, and near his residence there are gates in either fence for a farm crossing between the pasture and the portion of the farm east of the track. The gate in the west fence leading into the pasture consisted of four boards placed horizontally, with suitable spaces between them, and is described by the plaintiff as "an ordinary farm gate, such as farmers frequently use,— these gates with boards that slide on the end." It did not swing on hinges, but at its pivotal end — which was the south end thereof — it swung upon boards fastened to two posts a short distance apart, the upper board of the gate and the one next the bottom board thereof resting on the boards so fastened to the posts. It opened into the pasture, and when closed rested against a post at the north end thereof, which prevented it from opening towards the railroad. In such post, and on the west or pasture side of it, were driven, originally, two pieces of $\frac{5}{8}$-inch iron for fastenings. About two inches of each piece was bent upwards so as to form a hook. These hooks were so located that when the gate was properly closed the upper board rested on the upper hook, and the board next the bottom rested on the lower hook. This placed the gate level, and made it a little more than four and one-half feet high.

The gate remained in this condition until a short time — perhaps twenty days — before the night the horses escaped from the pasture, when, either by the action of high water or by reason of tightening the wire fence attached to the north post, that post became turned so that the fastenings were on the north instead of the west side thereof, and hence were useless. Hudson thereupon drew the lower fastening, and drove it into the west side of the post in its former position, but did nothing with the upper fastening. When in this position the gate could be closed as before by raising it so that the board next the bottom would rest on the lower hook. This would leave the gate level, and at the height above mentioned. Hudson and family frequently passed through this gate to and from the pasture, and some of his family did so on the evening the plaintiff's horses were turned into the pasture. The gate was usually left at night in the position just indicated, but during the day the board next the top board, instead of the one next the bottom, was allowed to rest on the hook. In that position the north end of the gate was only about three feet eight inches high — the south end remaining at the original height. On the evening in question, however, the gate was left with the board next the top resting on the hook. On the following morning plaintiff found his horses on the railroad track, and, while endeavoring to get them off, a locomotive attached to a passenger train running north ran against and killed them. An inspection of the ground and tracks of the horses satisfied all parties that one of the horses jumped the gate at the north end thereof, and in doing so tore the gate loose from the hook and partly opened it, and the other horse went upon the track through the opening. The foregoing facts are not controverted.

At the close of the plaintiff's testimony, and again at the close of all the testimony in the case, defendant's counsel moved for a nonsuit. Both motions were denied. No ques-

tions arise upon the pleadings or the admission or rejection of testimony. The only negligence imputed to the defendant is that the gate was not in a proper condition at the time the horses escaped from the pasture over or through it and went upon the railroad track. The court submitted two questions of fact to the jury. These are: (1) Was the gate a proper one, and provided with suitable fastenings, so that it could be hung at a proper height? and if not, (2) Was the killing of the plaintiff's horses the direct result of a defect in the gate? The jury returned a verdict for the plaintiff, assessing his damages at $250. Counsel for the defendant moved for judgment *non obstante veredicto*, which motion was denied. He then moved for a new trial, which motion was also denied. Judgment for the plaintiff was thereupon entered, pursuant to the verdict. The defendant appeals from such judgment.

For the appellant there was a brief signed by *J. W. Losey*, and the cause was argued orally by *C. H. Schweitzer* and *G. M. Woodward*.

*Wm. H. Evans*, for the respondent.

LYON, J. The gate in question, with its appliances for fastening, as originally constructed, undoubtedly fulfilled the requirements of the statute, and was a sufficient gate. This is not controverted. The only negligence imputed to the railroad company was its failure to restore the upper hook or fastening to its former position after the post had become turned. If that hook was essential to the security of the gate, such failure may have been negligence on the part of the defendant. But the evidence is entirely satisfactory that the absence of the hook did not affect, to any appreciable extent, the efficiency of the gate as an obstacle to the escape of animals from the pasture to the track. The gate was constructed to resist pressure from the west or pasture side of it, from which side only animals would at-

tempt to pass it. When the board next the lowest board rested on the hook, the gate was level, and above the lawful height, and was just as effectual an obstacle to the escape of animals from the pasture as it would have been had the upper hook been in place, with the top board resting upon it. Had the gate been properly closed on the night in question it would have offered no greater inducement to plaintiff's horse to jump it, and would have made it no easier for him to do so, than it would had both hooks been in position. The absence of the upper hook could have had no influence in causing the gate to be left improperly closed and fastened. Neither was it any easier for the horses to jump the gate when thus improperly closed than it would have been had both hooks been in place.

Hence we conclude that, under the undisputed evidence, the absence of the upper hook was not negligence on the part of the defendant which contributed directly to the killing of plaintiff's horses. Under all the authorities, the railroad company is not liable for the negligence of the person who, without its knowledge, left the gate insufficiently closed so recently before the horses were killed.

It necessarily results from the foregoing views that the motion for a nonsuit submitted at the close of the testimony should have been granted. The same having been denied, the motion for a new trial should have prevailed. The judgment of the circuit court must therefore be reversed, and the cause will be remanded for a new trial.

*By the Court.*— Ordered accordingly.